**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JOHNNY ELLERY SMITH,<br>*Defendant-Appellant.* | No. 17-30248<br><br>D.C. No.<br>3:16-cr-00436-BR-1<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted October 10, 2018
Portland, Oregon

Filed May 28, 2019

Before: Raymond C. Fisher, Richard R. Clifton, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan;
Concurrence by Judge Fisher

## SUMMARY[*]

### Criminal Law

The panel affirmed a conviction for two counts of fleeing or attempting to elude a police officer in violation of Oregon Revised Statutes § 811.540(1), as assimilated by 18 U.S.C. § 13, the Assimilative Crimes Act (ACA), and 18 U.S.C. § 1152, the Indian Country Crimes Act (ICCA).

The panel held that the ACA applies to Indian country, by operation of both 18 U.S.C. § 7 (concerning land "reserved or acquired for the use of the United States" and "under the exclusive or concurrent jurisdiction thereof") and the ICCA (concerning "federal enclave" laws).

The panel held that the ACA, when invoked in Indian country, is subject to the exceptions set forth in the ICCA, namely: (1) "offenses committed by one Indian against the person or property or property of another Indian," (2) "any Indian committing any offense in the Indian country who has been punished by the local law of the tribe," or (3) "any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."  The panel held that the Indian-on-Indian exception in the ICCA does not preclude application of the ACA to all "victimless" crimes, and certainly not to the offense in this case.  Noting that the ICCA excludes from federal prosecution only Indian defendants who have already been punished by their tribe, the panel rejected the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

defendant's contention that because he *could* have been punished in tribal court for the same conduct, his prosecution under the ACA was a needless and unlawful intrusion into tribal sovereignty.

The panel rejected the defendant's claim that 18 U.S.C. § 1153, the Major Crimes Act (MCA), precludes the government from prosecuting any "state crimes" in Indian country that are not listed in the MCA, such as Smith's offense of fleeing and attempting to elude the police as defined under Oregon law.

Concurring, Judge Fisher agreed with the majority that the ACA applies to "Indian country" subject to the ICCA's three exceptions. Observing that there are two ways to arrive at that result, he wrote that he has some reservations about the majority's chosen approach – that the ACA applies to Indian country on its own terms subject to the ICCA's exceptions.

---

## COUNSEL

Conor Huseby (argued), Assistant Federal Public Defender, Office of the Federal Public Defender, Portland, Oregon, for Defendant-Appellant.

Paul T. Maloney (argued), Assistant United States Attorney; Kelly A. Zusman, Appellate Chief; Billy J. Williams United States Attorney; United States Attorney's Office, Portland, Oregon; for Plaintiff-Appellee.

Veronica C. Gonzales-Zamora, Brownstein Hyatt Farber Schreck LLP, Albuquerque, New Mexico; Barbara L. Creel, Southwest Indian Law Clinic, University of New Mexico School of Law, Albuquerque, New Mexico; for Amicus Curiae Southwest Indian Law Clinic.

## OPINION

CALLAHAN, Circuit Judge:

Defendant-appellant Johnny Ellery Smith appeals from his district court conviction, by guilty plea, of two counts of fleeing or attempting to elude a police officer in violation of Oregon Revised Statutes (ORS) § 811.540(1), as assimilated by 18 U.S.C. § 13, the Assimilative Crimes Act (ACA), and 18 U.S.C. § 1152, the Indian Country Crimes Act (ICCA). Smith argues that the federal government lacked jurisdiction to prosecute him for his violation of state law in Indian country because the ACA does not apply to Indian country. While previous decisions may state otherwise, Smith argues that these cases merely assumed the applicability of the ACA to Indian country and did not directly address it, and thus do not control. Second, Smith contends that even if the ACA applies generally to Indian country, federal prosecution under the ACA was barred in his case because he could have been prosecuted under tribal law for the same offense. Third, Smith asserts that 18 U.S.C. § 1153, the Major Crimes Act (MCA), "occupies the field of federal court jurisdiction over Indian country violations of state laws" and thus precludes federal prosecution of his assimilated state crime.

We do not find Smith's arguments persuasive. To the extent that this issue was not settled by the Supreme Court decision in *Williams v. United States*, 327 U.S. 711 (1946), and our decision in *United States v. Marcyes*, 557 F.2d 1361 (9th Cir. 1977), we confirm that the ACA applies to Indian country, through the operation of 18 U.S.C. § 7 and § 1152. The district court had jurisdiction over Smith's offenses under the ACA and the ICCA, and accordingly we affirm his convictions.

## I.

Smith is an enrolled Indian member of the Confederated Tribes of Warm Springs. In September 2016, Smith fled in his vehicle from Warm Springs police officers when they tried to initiate a traffic stop, leading the officers on a high-speed pursuit. During this chase, Smith drove at speeds exceeding 77 miles per hour, crossed over the fog line multiple times, and traveled in the opposing lane of traffic for approximately 100 yards. He eventually turned onto an unpaved dirt path, at which point the officers stopped their pursuit for safety reasons.

Less than two months later, Smith again fled from Warm Springs police officers when they attempted to conduct a traffic stop after observing him speeding. During this pursuit, Smith drove up to 120 miles per hour, failed to stay in the proper lane, drove into the opposite lane of travel, and at one point, slammed on his brakes, causing a pursuing patrol vehicle to rear-end his vehicle. Eventually the officers forced Smith's vehicle off the road, where he exited his vehicle and attempted to flee on foot, but was ultimately stopped and arrested. Both incidents occurred on the Warm Springs Indian Reservation within the State of Oregon.

Smith was charged in federal district court with two counts of fleeing or attempting to elude a police officer, in violation of ORS § 811.540(1), as assimilated by the ACA and the ICCA.  Smith was not charged in tribal court for fleeing or attempting to elude a police officer based on these incidents.

Smith filed a motion to dismiss the indictment on the ground that the government lacked jurisdiction to charge him in federal court for a state law violation alleged to have been committed by an Indian in Indian country.  The district court denied the motion, after which Smith pled guilty to the two counts in the indictment, while reserving his right to appeal the district court's decision on the jurisdictional issue.

## II.

We review de novo jurisdictional issues over criminal offenses.  *United States v. Begay*, 42 F.3d 486, 497 (9th Cir. 1994).

Smith's primary jurisdictional challenge to his convictions is that the ACA does not apply to Indian country, despite the line of cases that have suggested or stated otherwise.  The original, and most commonly cited, precedent for the proposition that the ACA applies to Indian country is *Williams*, wherein the Supreme Court stated:

> It is not disputed that this Indian reservation is "reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof," or that it is "Indian country" within the meaning of [the ICCA].  This means that many sections of the Federal Criminal Code apply to the

> reservation, including . . . the Assimilative
> Crimes Act . . . .

327 U.S. at 713 (footnotes omitted) (quoting 18 U.S.C. § 451, the predecessor to 18 U.S.C. § 7). In *Marcyes*, we relied on *Williams* in rejecting an argument raised by amicus curiae against the applicability of the ACA to Indian country, which was virtually identical to the challenge Smith raises here:

> Amicus' argument that the [Supreme Court in *Williams*] merely assumed [the ACA's] applicability without deciding the question is belied by the court's own words . . . .
>
> We would also note that the *Williams* court's ultimate decision . . . would never had been reached had the court felt that the A.C.A. did not apply to any crime committed upon Indian lands. *Our own review* of the language of 18 U.S.C. § 13 and 18 U.S.C. § 1152 convinces us that the district court was correct in holding that the A.C.A., by its own terms and through § 1152, is applicable to Indian country.

557 F.2d at 1365 n.1 (emphasis added).  In several other decisions, we have upheld or asserted the applicability of the ACA in Indian country.[1]  Other circuits are in accord.[2]

These prior decisions indicate that the ACA applies to Indian country.    Smith alleges, however, that the jurisdictional question was never directly at issue in those other cases but merely assumed, such that we are not bound by those decisions.    We do not need to address that contention.    Because the jurisdictional question is now directly before us, we expressly hold that the ACA applies to Indian country, based both on precedent and our own analysis of the ACA and the ICCA.

---

[1] *E.g.*, *Acunia v. United States*, 404 F.2d 140, 142 (9th Cir. 1968) ("[T]he [ACA] is among the general laws which the first paragraph of [the ICCA] extends to Indian territory."); *United States v. Kaufman*, 862 F.2d 236, 237-38 (9th Cir. 1988) (per curiam) (upholding appellant's conviction under the ACA for pointing a firearm at another person in violation of an Oregon statute while "at the Chemawa Indian School construction site, which is within a federal enclave"); *United States v. Errol D., Jr.*, 292 F.3d 1159, 1164 (9th Cir. 2002) ("[T]he government could have charged Errol D. under [the ICCA], which, by extending the [ACA] to Indian territory, would have rendered him criminally liable for a 'like offense' and a 'like punishment' under state law."); *United States v. Bare*, 806 F.3d 1011, 1016-17 (9th Cir. 2015) (holding that, under the ICCA, appellant "is subject to punishment in Indian Country—by the United States—which incorporates in the federal offense the elements of Arizona's disorderly conduct statute under the ACA").

[2] *E.g.*, *United States v. Sosseur*, 181 F.2d 873, 874 (7th Cir. 1950) (citing *Williams* to hold that "the [ACA] . . . has been conclusively held applicable to the Indian country"); *United States v. Thunder Hawk*, 127 F.3d 705, 707 (8th Cir. 1997) (stating that the ACA "is one of the federal enclave laws made applicable to Indian country by the ICCA"); *United States v. Pino*, 606 F.2d 908, 915 (10th Cir. 1979) (concluding that the ACA "assimilates state traffic laws and others into federal enclave law" and "reaches activities on Indian reservations").

## A.  The Assimilative Crimes Act

As with all questions of statutory interpretation, we turn first to the text of the statute.  The ACA states in part:

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in [18 U.S.C. § 7] . . . is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13(a).  The plain text of the ACA lacks any express reference to Indians or Indian country.  The statute on its face also contains no limitation based on the status of the defendant, to include whether he is Indian or non-Indian.  Instead, it begins with the all-encompassing term "[w]hoever" in regards to whom it might apply—so long as this person commits the offense "within or upon any of the places now existing or hereafter reserved or acquired as provided in [18 U.S.C. § 7]."  *Id.*

Hence, the jurisdictional "hook" of the ACA is the situs of the offense, which hinges on the ACA's reference to 18 U.S.C. § 7.  This federal criminal statute defines areas within the "special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 7, which are often referred to as "federal enclaves."  *See United States v. Markiewicz,* 978 F.2d 786, 797 (2d Cir. 1992) ("[F]ederal enclave laws are a group of statutes that permits the federal courts to serve

as a forum for the prosecution of certain crimes when they occur within the '[s]pecial maritime and territorial jurisdiction of the United States', 18 U.S.C. § 7; this jurisdiction includes federal land, and property such as federal courthouses and military bases.") (alteration in original).  If an offense is committed in a federal enclave *and* there is no federal statute defining that offense (i.e., an offense "not made punishable by any enactment of Congress"), the federal government may nonetheless prosecute the offense through the ACA by assimilating a "like offense" and "like punishment" from the law of the state in which the federal enclave is situated.  *See Lewis v. United States*, 523 U.S. 155, 160 (1998) ("The ACA's basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves.").

Our first question then is whether "Indian country"—or more specifically, the Warm Springs Indian Reservation where Smith's offenses occurred—qualifies as one of these "places . . . reserved or acquired as provided in [18 U.S.C. § 7]."  *See* 18 U.S.C. § 13(a).  Smith contends that Indian country does not fall within the meaning of 18 U.S.C. § 7 because the section lacks any reference to Indian country or Indian reservations.  Despite the apparent absence of the term "Indian" however, 18 U.S.C. § 7(3) defines federal territorial jurisdiction to include "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof."  Based on a plain reading of this text, any Indian reservation or land that is (1) "reserved or acquired for the use of the United States," and (2) "under the exclusive or concurrent jurisdiction thereof" falls within the ambit of 18 U.S.C. § 7.

Turning first to whether Indian country is "reserved or acquired for the use of the United States," we have stated

that the meaning of this phrase in section 7(3) "is plain enough. Courts have demonstrated their faith in the words' clarity by skipping over them without explication." *United States v. Corey*, 232 F.3d 1166, 1176 (9th Cir. 2000). In cases such as *Williams*, *Marcyes*, and others, courts have readily accepted that Indian reservations are "reserved or acquired for the use of the United States" within the meaning of 18 U.S.C. § 7(3) without much discussion. *See, e.g.*, *Guith v. United States*, 230 F.2d 481, 482 (9th Cir. 1956) ("[A]ppellant's ranch, being located in 'Indian country', is on 'lands reserved . . . for the use of the United States, and under exclusive . . . jurisdiction thereof', within 18 U.S.C. § 7(3)."); *Pino*, 606 F.2d at 915 ("The [ACA] reaches activities on Indian reservations since such areas are 'reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof.'").

Smith argues that tribal lands were not "reserved or acquired for the use of the United States" by referencing two specific treaties between the federal government and Indian tribes in Oregon and Washington that "cede[d] certain lands to the United States while reserving lands for 'exclusive use' by tribes." But for lands to be "reserved or acquired for the use of the United States" under 18 U.S.C. § 7(3), "[t]here is no requirement that the United States be an owner, or even an occupant, so long as the land has been set aside for the use of an instrumentality of the federal government." *Corey*, 232 F.3d at 1177. In the 1850s, when "the federal government began frequently to reserve public lands from entry for Indian use," "the modern meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence or use of tribal Indians." *Cohen's Handbook of Federal Indian Law* § 3.04 at 190 (Nell Jessup Newton ed., 2017) (citations omitted). "This use of the term 'reservation' from public land law soon

merged with the treaty use of the word to form a single definition describing federally protected Indian tribal lands without depending on any particular source." *Id*. at 191. Contrary to Smith's claim, the treaties he cites provide specific examples of how Indian reservations were "reserved or acquired" by the United States for the federal purpose of protecting Indian tribes, which traditionally were considered "wards of the nation" under federal law. *See generally Donnelly v. United States*, 228 U.S. 243 (1913); *United States v. Kagama*, 118 U.S. 375 (1886); *Worcester v. Georgia*, 31 U.S. 515 (1832).

Second, we turn to whether Indian country falls "under the exclusive or concurrent jurisdiction" of the United States. This phrase in section 7(3) "refers to 'legislative jurisdiction,'" which means "the state's authority 'to make its law applicable to the activities, relations, or status of persons'" within a territory. *Corey*, 232 F.3d at 1177–78 (quoting the *Restatement (Third) of the Foreign Relations Law of the United States* § 401 (1987)). Given this, the United States' jurisdiction over Indian country—if measured by its authority to legislate with regard to Indian territories and the activities within—seems apparent. The Supreme Court has long recognized Congress' "broad general powers" under the Constitution to regulate with respect to Indian affairs—"powers that [have been] consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004) (quoting *Washington v. Confederated Bands & Tribes of Yakima Nation*, 439 U.S. 463, 470–71 (1979); *Negonsott v. Samuels*, 507 U.S. 99, 103 (1993); *United States v. Wheeler*, 435 U.S. 313, 323 (1978)).

The history of 18 U.S.C. § 7 and other statutes by which Congress defined Indian country and asserted federal criminal jurisdiction over newly acquired territories, to

include tribal lands, also supports this view. "As the United States acquired new possessions, Congress extended federal criminal jurisdiction with the boundaries of the young republic[,]" and "did so by reference" to federal criminal jurisdiction in federal enclaves. *Corey*, 232 F.3d at 1174, 1175. The original Federal Crimes Act of 1790 referred to federal enclaves as "any fort, arsenal, dock-yard, magazine, or . . . any other place or district of country, under the sole and exclusive jurisdiction of the United States," 1 Stat. 112, § 3 (1790), and the Indian Boundaries Act of 1817[3] and the Indian Intercourse Act of 1834[4] similarly referred to crimes committed in places "under the sole and exclusive jurisdiction of the United States." As the statutory definition of federal enclave jurisdiction evolved into what is now the

---

[3] Titled "An Act to Provide for the Punishment of Crimes and Offences Committed Within the Indian Boundaries," the statute provided for the punishment of crimes committed by "any Indian or other person or persons . . . within the United States, and within any town, district, or territory, belonging to any nation or nations, tribe or tribes, of Indians, commit any crime, offence, or misdemeanor, which if committed in any place or district of country under the sole and exclusive jurisdiction of the United States, would, by the laws of the United States, be punished with death, or any other punishment . . . ." Act of March 3, 1917, ch. 92, § 1, 3 Stat. 383 (1817). Section 2 of the act gave federal courts jurisdiction to hear and try these offenses, with the exception of "any offence committed by one Indian against another, within any Indian boundary." *Id.* § 2, 3 Stat. 383.

[4] Section 25 provided that the "punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States, shall be in force in the Indian country" except for "crimes committed by one Indian against the person or property of another Indian." *See* An Act to Regulate Trade and Intercourse with the Indian Tribes and to Preserve Peace on the Frontiers, ch. 161, § 25, 4 Stat. 733 (1834).

ACA in 18 U.S.C. §§ 7 and 13,[5] the language used to describe and define federal criminal definition of federal jurisdiction in Indian country was likewise updated. When Congress enacted the ACA and the ICCA as part of the revised and consolidated federal criminal code in 1948, it also codified the definition of Indian country as "all land within the limits of any Indian reservation *under the jurisdiction of the United States Government*." 18 U.S.C. § 1151(a) (emphasis added). In that sense, perhaps the most direct indicator that Indian country, as currently defined in the federal criminal code, falls within the "jurisdiction of the United States" comes from the express language of the statutory definition itself.

In light of the above, we hold that the ACA applies to Indian country by virtue of 18 U.S.C. § 7.

---

[5] In the Federal Crimes Act of 1825, Congress broadened the definition of federal enclaves, *see* An Act More Effectually to Provide for the Punishment of Certain Crimes against the United States and for Other Purposes, ch. 65, § 1, 4 Stat. 115 (1825), and also enacted the provision that "provided the basis from which has grown the Assimilative Crimes Act now before us." *See id.* § 3, 4 Stat. 115; *United States v. Sharpnack*, 355 U.S. 286, 290 (1958). In 1909, Congress consolidated various criminal jurisdictional provisions into a single statute, wherein its definition of federal enclaves included "any lands reserved or acquired for the exclusive use of the United States, and under the exclusive jurisdiction thereof. . . ." *See* Act of March 4, 1909. ch. 321, § 272, 35 Stat. 1088, 1143. This precursor to 18 U.S.C. § 7(3) was expanded in 1940 to include land over which the federal government had "concurrent" jurisdiction. *See* Act of June 11, 1940, ch. 323, 54 Stat. 304 (1940).

## B. The Indian Country Crimes Act

Our review of the ICCA (sometimes referred to as the General Crimes Act) further supports the applicability of the ACA to Indian country. The ICCA states:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1152.

Courts have repeatedly interpreted the "general laws of the United States" in the ICCA to refer to "federal enclave laws," meaning those laws passed by the federal government in exercise of its police powers in areas of exclusive or concurrent federal jurisdiction as defined in 18 U.S.C. § 7. *E.g.*, *Begay*, 42 F.3d at 498 ("[U]nder § 1152, Congress mandated that the 'general laws' of the United States applicable in federal enclaves, such as national parks, military bases, veterans' hospitals, federal buildings, and federal prisons, apply in Indian country . . . ."); *United States*

*v. Strong*, 778 F.2d 1393, 1396 (9th Cir. 1985) ("[The ICCA] applies only to 'federal enclave law'—law in which the situs of the offense is an element of the crime."); *United States v. Torres*, 733 F.2d 449, 454 (7th Cir. 1984) ("In order to prosecute under 18 U.S.C. § 1152, the Government must prove, as a jurisdictional requisite, that the crime was in violation of a Federal enclave law . . . .").

The ACA, as a federal enclave law, thus also applies to Indian country by operation of the ICCA. Many prior cases uphold the applicability of an ACA violation in Indian country on this basis. *E.g.*, *United States v. Burland*, 441 F.2d 1199, 1200 (9th Cir. 1971) (finding "[o]ne of the 'general laws' referred to [in the ICCA] is the [ACA]," which "makes the Montana statute that prohibits passing forged checks . . . part of the federal law applicable on the Fort Peck reservation"); *Acunia*, 404 F.2d at 142 (holding "the [ACA] is among the general laws which the first paragraph of section 1152 extends to Indian territory"); *Thunder Hawk*, 127 F.3d at 707 (stating the ACA "is one of the federal enclave laws made applicable to Indian country by the ICCA").

Accordingly, we hold that the ACA applies to Indian country, by operation of both 18 U.S.C. § 7 and 18 U.S.C. § 1152.

## III.

Having recognized the general applicability of the ACA to Indian country, we turn next to whether the ACA is subject to any limitations when applied to Indian country, and if so, whether those limitations precluded jurisdiction in Smith's case. Smith argues that even if the ACA may generally apply to Indian country, the federal government cannot invoke the ACA to prosecute a state crime that is

already defined under tribal law. To do so, Smith alleges, would defeat the "gap-filling" purpose of the ACA, since there is no gap in criminal jurisdiction for the ACA to fill. This argument misconstrues the purpose of the ACA, which is aimed at "gaps in the federal criminal law"—not gaps in overall criminal jurisdiction—and simply allows the federal government to adopt state criminal law in order to prosecute violations on federal enclaves that are not specifically defined in the federal criminal code.

Nonetheless, we agree that the ACA may have a more limited reach in Indian country than it would in other federal enclaves, and, in particular, may be subject to the exceptions in the ICCA. In addressing this question, we recognize that our holdings above may present a seeming tension. If, on one hand, the ACA extends to Indian country through the ICCA, then naturally the ACA would be subject to the exceptions of the ICCA; but if the ACA applies to Indian country through 18 U.S.C. § 7, a provision independent of the ICCA, then shouldn't we reasonably find that the ACA can be invoked in Indian country without any regard to the ICCA's exceptions?

Our statutory review leads us to conclude that the ACA, when invoked in Indian country, is subject to the exceptions set forth in the ICCA. Several principles inform this determination. First, in our interpretation of the applicability of the ACA to Indian country, we are mindful that "the standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985). The Supreme Court has "consistently admonished that federal statutes and regulations relating to tribes and tribal activities must be 'construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the

federal policy of encouraging tribal independence.'" *Ramah Navajo Sch. Bd. v. Bureau of Revenue*, 458 U.S. 832, 846 (1982) (alterations in original); *see also Bryan v. Itasca Cty.*, 426 U.S. 373, 392 (1976) ("[W]e must be guided by that 'eminently sound and vital canon' that 'statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'") (citation omitted).

Second, we recognize that Congress' intent for the ACA to apply generally to federal enclaves within the meaning of 18 U.S.C. § 7 is not necessarily at tension with—or exclusive of—Congress' intent or ability to expand, limit, or otherwise modify the precise contours of the ACA's reach in specific types of federal enclaves by other statutes. Given that the ICCA is one of the primary laws enacted by Congress to "balance the sovereignty interest of Indian tribes and the United States' interest in punishing offenses committed in Indian country," *Begay*, 42 F.3d at 498, we find that Congress intended to impose its express limitations on all federal enclave laws in Indian country, including the ACA. This conclusion is consistent with precedent and with our view that the ACA extends to Indian country by virtue of the ICCA. *See Acunia*, 404 F.2d at 142 ("[I]t is clear that Congress did not intend that the [ACA] should apply to situations wherein, under the second paragraph of 18 U.S.C. § 1152, the extension to Indian country of the general laws of the United States for federal enclaves is specifically removed."); *United States v. Welch*, 822 F.2d 460, 463 (4th Cir. 1987) ("The [ACA] does not apply to crimes committed by one Indian against another Indian in Indian country . . . ."); *United States v. Wadena*, 152 F.3d 831, 840 n.13 (8th Cir. 1998) ("[U]nder the Assimilative Crimes Act, the exception involving Indian-against-Indian crimes would still apply." (citing *Thunder Hawk*, 127 F.3d at 706–08)).

Thus, the federal government may not invoke the ACA to prosecute cases in Indian country that the ICCA specifically excepts, namely: (1) "offenses committed by one Indian against the person or property of another Indian," (2) "any Indian committing any offense in the Indian country who has been punished by the local law of the tribe," or (3) "any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."  18 U.S.C. § 1152.  Here, these limitations did not prohibit the federal government's prosecution of Smith.

On this point, however, amicus argues that the Indian-on-Indian exception in the ICCA prohibits application of the ACA to "victimless" crimes in Indian country, which would include the Oregon crime of fleeing and eluding police in this case.  Amicus cites *United States v. Quiver*, 241 U.S. 602 (1916), where the Supreme Court dismissed a federal charge for adultery between two Indians in Indian country as barred by the ICCA's Indian-on-Indian exception.  The government had argued that the ICCA exception did not apply because adultery "is a voluntary act on the part of both participants, and, strictly speaking, not an offense against the person of either."  *Id*. at 605.  The Court rejected that argument in light of "the policy reflected by the legislation of Congress and its administration for many years, that the relations of the Indians among themselves—the conduct of one toward another—is to be controlled by the customs and laws of the tribe, save when Congress expressly or clearly directs otherwise[.]"  *Id.* at 605–06.

We do not read *Quiver*'s emphasis on Congress' policy from "an early period" to "permit the personal and domestic relations of the Indians with each other to be regulated . . . according to their tribal customs and laws" to mean that the

ICCA's Indian-on-Indian exception prohibits federal prosecution of any "victimless" crimes. *Id.* at 603–04. Federal policy towards the exercise of tribal sovereignty has evolved and fluctuated over time, particularly since *Quiver* was decided in 1916. *See United States v. Lara*, 541 U.S. 193, 202 (2004) ("From the Nation's beginning . . . the Government's Indian policies . . . of necessity would fluctuate dramatically as the needs of the Nation and those of the tribes changed over time. And Congress has in fact authorized at different times very different Indian policies . . . . Such major policy changes inevitably involve major changes in the metes and bounds of tribal sovereignty.") (citation omitted). The laws passed by Congress to effectuate its policies on criminal jurisdiction in Indian country have never placed any explicit emphasis on the "victimless" nature of a crime.

The Eighth Circuit, in considering similar challenges to a federal prosecution of an Indian for driving under the influence in Indian country, reached the same conclusion. *See Thunder Hawk*, 127 F.3d at 709 ("We do not believe . . . that *Quiver* stands for the proposition that the 'Indian versus Indian' exception applies to every 'victimless' crime involving Indians."). As the Eighth Circuit reasoned:

> *Quiver* involved domestic relations, an area traditionally left to tribal self-government. In such a case, including "victimless" crimes within the "Indian versus Indian" exception preserves the tribe's exclusive jurisdiction over domestic matters. Here, in contrast, the prohibition of and punishment for driving under the influence has not traditionally been within the exclusive jurisdiction of Indian tribes. Rather, the ACA "assimilates state

traffic laws and others into federal enclave law in order 'to fill in the gaps in the Federal Criminal Code, where no action of Congress has been taken to define the missing offense.'" Moreover, the offense of driving under the influence is more akin to an offense against the public at large, both Indian and non-Indian, rather than a true "victimless" crime.

127 F.3d at 709 (citations omitted). Likewise, Smith's offense of fleeing and eluding the police is a public safety offense, rather than a true "victimless" crime, and falls well outside the area of domestic relations "traditionally left to tribal self-government." *Id*. Thus, we join the Eighth Circuit's view that the Indian-on-Indian exception in the ICCA does not preclude application of the ACA to all "victimless" crimes, and certainly not to the offense in this case.

Smith also asserts that because he *could* have been prosecuted in tribal court for the same conduct, his prosecution by the federal government under the ACA "was a needless and unlawful intrusion into tribal sovereignty." Smith provides no legal authority for the proposition that the federal government may not prosecute where the tribe also has the authority to do so, nor do we find it supported by the text or purpose of the ACA or the ICCA. The second exception in the ICCA plainly refers to "any Indian . . . who *has* been punished by the local law of the tribe," not any Indian who *could* be punished by the law of the tribe. 18 U.S.C. § 1152 (emphasis added). By excluding from federal prosecution only Indian defendants who have already been punished by their tribe, this provision aptly strikes at the "balance" that Congress sought to achieve with the ICCA

between "the sovereignty interest of Indian tribes and the United States' interest in punishing offenses committed in Indian country." *Begay*, 42 F.3d at 498. It both defers to tribal criminal proceedings and allows for federal prosecution where a tribe might choose not to exercise its authority.

We also note that, in some instances, even the dual prosecution by both federal and tribal authorities for the same conduct has been upheld as constitutionally permissible. *See Wheeler*, 435 U.S. at 314 (holding that "the prosecution of an Indian in a federal district court under the Major Crimes Act, 18 U.S.C. § 1153, when he has previously been convicted in a tribal court of a lesser included offense arising out of the same incident" is not barred by the Double Jeopardy Clause). Contrary to Smith's contention then, the federal prosecution in this case was not an "unlawful intrusion into tribal sovereignty," but rather a permissible exercise of concurrent jurisdictional authority often held by different sovereigns in Indian country. *See Duro v. Reina*, 495 U.S. 676, 680 n.1 (1990) (explaining how jurisdiction in Indian country "is governed by a complex patchwork of federal, state, and tribal law"). Given that none of the ICCA's exceptions apply in this case, the district court had jurisdiction over Smith's offenses under the ACA.

## IV.

Finally, we reject Smith's claim that the MCA, 18 U.S.C. § 1153, precludes the federal government from prosecuting any "state crimes" in Indian country that are not listed in the MCA, such as Smith's offense of fleeing and attempting to elude the police as defined under Oregon law.

The MCA provides for federal jurisdiction over a list of enumerated crimes committed by Indians "against the person or property of another Indian or other person" within Indian country. 18 U.S.C. § 1153(a). In *Begay*, we already rejected the argument "that Indians may not be charged for *any* criminal conduct beyond those crimes enumerated in [the MCA]." 42 F.3d at 498 (emphasis in original). Similarly, neither the text nor history of these statutes supports Smith's assertion that the MCA limits federal jurisdiction over any "violations of state law" in Indian country outside those listed in that statute. The text of the MCA lacks any express reference to, much less any limitation of, other laws—such as the ICCA or the ACA—that establish federal authority to prosecute crimes in Indian country.

Furthermore, the MCA was enacted as "a direct response" to the Supreme Court's interpretation of the ICCA, or more accurately, its predecessor in Revised Statutes §§ 2145 and 2146.[6] *Keeble v. United States*, 412 U.S. 205, 209 (1973) ("The Major Crimes Act was passed by Congress in direct response to the decision of this Court in *Ex parte Crow Dog*, 109 U.S. 556 (1883) . . . [where we held] that a federal court lacked jurisdiction to try an Indian for the murder of another Indian . . . in Indian country."). "The prompt congressional response—conferring jurisdiction on the federal courts to punish certain offenses—reflected a view that tribal remedies were either

---

[6] Revised Statutes §§ 2145 and 2146, later codified in 25 U.S.C. §§ 217 and 218, were the direct progenitor for the ICCA enacted in 1948. Section 2145 asserted federal criminal jurisdiction over violations of the "general laws of the United States" in Indian country, while § 2146 provided for certain exceptions that were virtually identical to the exceptions in the current ICCA.

nonexistent or incompatible with principles that Congress thought should be controlling." *Id.* at 210. Because the ICCA did not "extend to offenses committed by an Indian against another Indian, nor to any Indian . . . who has been punished for that act by the local law of the tribe," 18 U.S.C. § 1152, the MCA "partially abrogated [this exception in the ICCA] by creating federal jurisdiction over fourteen enumerated crimes committed by Indians against Indians or any other person in Indian country." *United States v. Male Juvenile*, 280 F.3d 1008, 1013, 1019 (9th Cir. 2002) ("The MCA was enacted after the [ICCA] . . . as an exception to or abrogation of the [ICCA]."); *Donnelly*, 228 U.S. at 269–70 (explaining that the MCA of 1885 did not repeal the entire ICCA predecessor but instead "manifestly repeal[ed] in part the limitation that was imposed" by the specific exceptions).

Thus, rather than limit federal authority over crimes by Indians in Indian country, the MCA extended it to specific "major crimes," thereby partially withdrawing the exclusive authority of tribes over Indian-on-Indian crimes previously afforded by the ICCA. The MCA did not otherwise affect the federal criminal jurisdiction that was already established by the ICCA for violations of the ACA and other federal enclave laws in Indian country. For these reasons, the MCA does not preclude the application of the ACA to Smith's offenses.

## V.

We hold that the Assimilative Crimes Act applies to crimes in Indian country, and that neither the Indian Country Crimes Act nor the Major Crimes Act precluded the federal government from exercising its jurisdiction to prosecute Smith for his violations of Oregon Revised Statutes § 811.540(1) under the Assimilative Crimes Act. We uphold

the district court's denial of the motion to dismiss for lack of jurisdiction and **AFFIRM** Smith's conviction.

---

FISHER, Circuit Judge, concurring:

I agree with the majority that the Assimilated Crimes Act (ACA) applies to "Indian country" subject to the Indian Country Crimes Act (ICCA)'s three exceptions. *See* 18 U.S.C. § 1151 (defining "Indian country"); *id.* § 1152 (providing that the ICCA "shall not extend [1] to offenses committed by one Indian against the person or property of another Indian, nor [2] to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or [3] to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively").

There are two ways to arrive at that result. One is to hold that the ACA applies to Indian country only through the ICCA, not on its own terms – i.e., that the ACA is part of "the general laws of the United States" under the ICCA, *id.* § 1152, but Indian country is not among the "lands reserved or acquired for the use of the United States" under the ACA, *id.* §§ 7(3), 13. A second way to arrive at this result (the one adopted by the majority) is to hold that the ACA applies to Indian country on its own terms – i.e., that Indian country *is* among the "lands reserved or acquired for the use of the United States" under § 7(3) – but that Congress nonetheless intended the ACA's application to Indian country to be subject to the ICCA's three exceptions.

I have some reservations about the majority's chosen approach. *See Cohen's Handbook of Federal Indian Law* § 9.02 n.19 (Nell Jessup Newton ed., 2017) ("Only one court

stated that the ACA applied of its own force within Indian country, in a case in which the point was not in issue. *United States v. Marcyes*, 557 F.2d 1361, 1365 n.1 (9th Cir. 1977). The statement is inconsistent with the policy of leaving tribes free of general federal criminal laws, except as expressly provided."). Under either approach, however, the bottom line is the same: the ACA applies to Indian country subject to the ICCA's three exceptions. Accordingly, I concur.