BOSSE v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:BOSSE v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 BOSSE v. STATE
2021 OK CR 3
Case Number: PCD-2019-124
Decided: 03/11/2021
SHAUN MICHAEL BOSSE, Petitioner v. STATE OF OKLAHOMA, Respondent.
Cite as: 2021 OK CR 3, __ __

 

 

OPINION GRANTING POST-CONVICTION RELIEF

KUEHN, PRESIDING JUDGE:

¶1 Shaun Michael Bosse was tried by jury and convicted of three counts of First Degree Murder and one count of First Degree Arson in the District Court of McClain County, Case No. CR-2010-213. He was sentenced to death on the murder counts and to thirty-five (35) years imprisonment and a $25,000.00 fine for the arson count.

¶2 On direct appeal, this Court upheld Petitioner's convictions and sentences.[1] Petitioner's first Application for Post-Conviction Relief in this Court was denied.[2] Petitioner filed this Successive Application for Post-Conviction Relief on February 20, 2019. The crux of Petitioner's Application lies in his jurisdictional challenge.

¶3 In Proposition I Petitioner claims the District Court lacked jurisdiction to try him. Petitioner argues that his victims were citizens of the Chickasaw Nation, and the crime occurred within the boundaries of the Chickasaw Nation. He relies on McGirt v. Oklahoma, 140 S.Ct. 2452 (2020) in which the United States Supreme Court reaffirms the basic law regarding federal, state and tribal jurisdiction over crimes, which is based on the location of the crimes themselves and the Indian status of the parties. The Court first determined that Congress, through treaty and statute, established a reservation for the Muscogee Creek Nation. Id., 140 S.Ct. at 2460-62. Having established the reservation, only Congress may disestablish it. Id., 140 S.Ct. at 2463; Solem v. Bartlett, 465 U.S. 463, 470 (1984). Congress must clearly express its intent to disestablish a reservation, commonly with an "explicit reference to cession or other language evidencing the present and total surrender of all tribal interests." McGirt, 140 S.Ct. at 2462 (quoting Nebraska v. Parker, 136 S.Ct. 1072, 1079 (2016)). The Court concluded that Congress had not disestablished the Muscogee Creek Reservation. McGirt, 140 S.Ct. at 2468. Consequently, the federal and tribal governments, not the State of Oklahoma, have jurisdiction to prosecute crimes committed by or against Indians on the Muscogee Creek Reservation. 18 U.S.C. §§ 1152, 1153.

¶4 The question of whether Congress has disestablished a reservation is primarily established by the language of the law -- statutes and treaties -- concerning relations between the United States and a tribe. McGirt, 140 S.Ct. at 2468. "There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms." McGirt, 140 S.Ct. at 2469. Neither historical practices, nor demographics, nor contemporary events, are useful measures of Congress's intent unless there is some ambiguity in statute or treaty language. Id. at 2468-69; see also Oneida Nation v. Village of Hobart, 968 F.3d 664, 675 n.4 (7th Cir. 2020) (McGirt "establish[ed] statutory ambiguity as a threshold for any consideration of context and later history."). Thus our analysis begins, and in the case of the Chickasaw Nation, ends, with the plain language of the treaties.

¶5 McGirt itself concerns only the prosecution of crimes on the Muscogee Creek Reservation. However, its reasoning applies to every claim that the State lacks jurisdiction to prosecute a defendant under 18 U.S.C. §§ 1152, 1153. Of course, not every tribe will be found to have a reservation; nor will every reservation continue to the present. "Each tribe's treaties must be considered on their own terms. . . ." McGirt, 140 S.Ct. at 2479. The treaties concerning the Five Tribes which were resettled in Oklahoma in the mid-1800s (the Muscogee Creek, Cherokee, Chickasaw, Choctaw, and Seminole) have significantly similar provisions; indeed, several of the same treaties applied to more than one of those tribes. It is in that context that we review Petitioner's claim.

¶6 On August 12, 2020, this Court remanded this case to the District Court of McClain County for an evidentiary hearing. The District Court was directed to make findings of fact and conclusions of law on two issues: (a) the victims' status as Indians; and (b) whether the crime occurred in Indian Country, within the boundaries of the Chickasaw Nation Reservation. Our Order provided that the parties could enter into written stipulations. On October 13, 2020, the District Court filed its Findings of Fact and Conclusions of Law in the District Court.

Stipulations regarding victims' Indian status

¶7 The parties stipulated that all three victims of the crime, Katrina and Christian Griffin and Chasity Hammer, were members of the Chickasaw Nation. This stipulation included recognition that the Chickasaw Nation is a federally recognized tribe. The District Court concluded as a matter of law that all three victims had some Indian blood and were recognized as Indian by a tribe or the federal government. We adopt these findings and conclusions, and find that the victims in this case were members of the Chickasaw Nation.

District Court Findings of Fact 

¶8 The District Court found that Congress established a reservation for the Chickasaw Nation of Oklahoma. The District Court found these facts:

(1) The Indian Removal Act of 1830 authorized the federal government to negotiate with Native American tribes for their removal to territory west of the Mississippi River in exchange for the tribes' ancestral lands. Indian Removal Act of 1830, § 3, 4 Stat. 411, 412.

(2) The 1830 Treaty of Dancing Rabbit Creek (1830 Treaty) granted citizens of the Choctaw Nation and their descendants specific land in fee simple, "while they shall exist as a nation and live on it," in exchange for cession of the Choctaw Nation lands east of the Mississippi River. Treaty of Dancing Rabbit Creek, art. 2, Sept. 27, 1830, 7 Stat 333. The Treaty provided that any territory or state should have neither the right to pass laws governing the Choctaw Nation nor embrace any part of the land granted the Choctaw Nation by the treaty. Id. art. 4. The land boundaries were:

[B]eginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian fork; if in the limits of the United States, or to those limits; thence due south to Red River, and down Red River to the west boundary of the Territory of Arkansas; thence north along that line to the beginning.

Id. art. 2.

(3) The 1837 Treaty of Doaksville (1837 Treaty) granted the Chickasaw Nation a district within the boundaries of the 1830 Treaty of Dancing Rabbit Creek, to be held by the Chickasaw Nation on the same terms as were granted to the Choctaw Nation. 1837 Treaty of Doaksville, art. 1, Jan. 17, 1837, 11 Stat 573.

(4) Congress modified the western boundary of the Chickasaw Nation in the 1855 Treaty of Washington (1855 Treaty), pledging to "forever secure and guarantee" the land to those tribes, and reserving them from sale without both tribes' consent. 1855 Treaty of Washington with the Choctaw and the Chickasaw, art. 1, 2, June 22, 1855, 11 Stat. 611. This Treaty also reaffirmed the Chickasaw Nation's right of self-government. Id. art. 7.

(5) In 1866, the United States entered into the 1866 Treaty of Washington (1866 Treaty), which reaffirmed both the boundaries of the Chickasaw Nation and its right to self-governance. 1866 Treaty of Washington with the Chickasaw and Choctaw, art. 10, Apr. 28, 1866, 14 Stat. 699.

(6) The parties stipulated that the location of the crime, 15634 212th St., Purcell, OK, is within the boundaries of the Chickasaw Nation set forth in the 1855 and 1866 Treaties.

(7) The property at which the crime occurred was transferred directly in 1905 from the Choctaw and Chickasaw Nations to George Roberts, in a Homestead Patent. Title may be traced directly to the Reservation lands granted the Choctaw and Chickasaw Nations, and subsequently allotted to individuals, and was never owned by the State of Oklahoma.

(8) The Chickasaw Nation is a federally recognized Indian tribe, exercising sovereign authority under a constitution approved by the United States Secretary of the Interior.

(9) No evidence before the District Court showed that the treaties were formally nullified or modified in any way to reduce or cede Chickasaw lands to the United States or to any other state or territory.

(10) The parties stipulated that if the District Court determined the treaties established a reservation, and if the District Court concluded that Congress never explicitly erased the boundaries and disestablished the reservation, then the crime occurred within Indian Country as defined by 18 U.S.C. § 1151(a).

District Court Conclusions of Law

¶9 The District Court first found, and this Court agrees, that the absence of the word "reservation" in the 1855 and1866 Treaties is not dispositive. McGirt, 140 S.Ct. at 2461. The court emphasized the language in the 1830 Treaty that granted the land "in fee simple to them and their descendants, to inure to them while they shall exist as a nation." 1830 Treaty, art. 2. The 1830 Treaty secured rights of self-government and jurisdiction over all persons and property with Treaty territory, promising that no state should interfere with the rights granted under the Treaty. Id. art. 4. That treaty applies to the Chickasaw Nation under the 1837 Treaty of Doaksville, which guaranteed the Chickasaw Nation the same privileges, rights of homeland ownership and occupancy granted the Choctaw Nation by the 1830 Treaty. 1837 Treaty, art.1. In the 1855 Treaty, the United States promised to "forever secure and guarantee" specific lands to the Choctaw and Chickasaw Nations, and reaffirmed those tribes' rights to self-government and full jurisdiction over persons and property within their limits. 1855 Treaty arts. 1, 7. This was reaffirmed in the 1866 Treaty, by which the Chickasaw and Choctaw Nations agreed to cede defined lands to the United States for a sum certain. 1866 Treaty, art. 3. Thus, the District Court concluded, the treaty promises to the Chickasaw Nation were not gratuitous. McGirt, 140 S.Ct. at 2460.

¶10 Based on this law, the District Court concluded that Congress established a reservation for the Chickasaw Nation. We adopt this conclusion of law.

¶11 The District Court found that Congress has not disestablished the Chickasaw Nation Reservation. After Congress has established a reservation, only Congress may disestablish it, by clearly expressing its intent to do so; usually this will require "an explicit reference to cession or other language evidencing the present and total surrender of all tribal interests." McGirt, 140 S.Ct. at 2463 (quoting Parker, 136 S.Ct. at 1079). The District Court found no explicit indication or expression of Congressional intent to disestablish the Chickasaw Reservation. The Court specifically stated, "No evidence was presented that the Chickasaw reservation was 'restored to public domain,' 'discontinued, abolished or vacated.' Without, [sic] explicit evidence of a present and total surrender of all tribal interests, the Court cannot find the Chickasaw reservation was disestablished." Findings of Fact and Conclusions of Law, CF-2010-213, PCD-2019-124, Oct. 13, 2020 at 9-10 (internal citations omitted).

¶12 Based on the evidence, the District Court concluded that Congress never erased the boundaries and disestablished the Chickasaw Nation Reservation. The Court further concluded that the crimes at issue occurred in Indian Country. We adopt these conclusions.

The State's Arguments 

¶13 After the evidentiary hearing, a supplemental brief was filed on behalf of the State of Oklahoma by the District Attorney for McClain County. The Attorney General and District Attorney ask this Court to find that the State of Oklahoma has concurrent jurisdiction with the federal and tribal governments where, as here, a non-Indian commits a crime against Indian victims in Indian Country. The Attorney General and the District Attorney suggest that various procedural defenses should apply. The District Attorney also raises a separate claim, arguing that this Court should alter its definition of Indian status, an argument not raised by the Attorney General.

Blood Quantum

¶14 The District Attorney states that the District Judge avoided the issue of blood quantum when making her findings and conclusions.[3] He now requests that this Court require a specific blood quantum to meet the definition of Indian status to avoid a "jurisdictional loophole". In the Remand Order, and in the numerous similar Orders in which we remanded other cases for consideration of the jurisdictional question, this Court clearly set out the definition of Indian it expected lower courts to use. We directed the District Court to "determine whether (1) the victims had some Indian blood, and (2) were recognized as an Indian by a tribe or by the federal government." This test, often referred to as the Rogers[4] test, is used in a majority of jurisdictions, including in cases cited by the District Attorney.

¶15 In stating this test we cited two cases from the Tenth Circuit, United States v. Diaz, 679 F.3d 1183, 1187 (10th Cir. 2012); United States v. Prentiss, 273 F.3d 1277, 1280-81 (10th Cir. 2001).[5] The references clearly state the test to be used in determining Indian status. Prentiss discusses the history, wide acceptance, and application of the Rogers test. The opinion notes that the first prong of the test may be proved by a variety of evidence, which may include a certificate of tribal enrollment which sets forth the person's degree of Indian blood, or a listing on a tribal roll which requires a certain degree of Indian blood. Prentiss, 273 F.3d at 1282-83. Diaz states that the Tenth Circuit uses a "totality-of-the-evidence approach," which may include proof of blood quantum, but only if a particular tribe requires it. Diaz, 679 F.3d at 1187.

¶16 The District Attorney correctly observes that a minority of courts have chosen to impose a particular blood quantum, or to state in individual cases whether a specific blood quantum meets the threshold of "some blood." The State of Oklahoma is within the jurisdictional boundaries of the Tenth Circuit. If the jurisdictional test is met and it is determined that a particular case must be prosecuted in a federal district court, the Tenth Circuit definition will govern in that court. There is simply no rhyme nor reason to require a test for Indian status in our Oklahoma state courts that is significantly different from that used in the comparable federal courts.[6] Consistency and economy of judicial resources compel us to adopt the same definition as that used by the Tenth Circuit.[7]

¶17 Without any foundation in law, the District Attorney speculates that, without a precise blood quantum requirement, a defendant might claim he is Indian in a state court -- thus defeating state court jurisdiction -- and yet be found not Indian in federal court, escaping criminal prosecution altogether. He cites no relevant or persuasive law to support this speculation. The District Attorney relies on a single case from the State of Washington, State v. Dennis, 840 P.2d 909 (Wash. App. 1992). Blood quantum was not an issue in that case and is not mentioned in the opinion. The defendant, a member of a Canadian tribe, was charged in state court with murdering his wife. In state court, defendant successfully argued that he was an Indian under the Major Crimes Act, Section 1153, and thus not subject to State jurisdiction. Of course, the federal district court found otherwise, since defendant was not a member of a federally recognized tribe. Id., 840 P.2d at 910. The State never appealed the initial dismissal in state district court. After federal charges were dismissed, the State of Washington attempted to reinstate the charges. The Washington Court of Appeals found that, given the State's failure to appeal the initial state court ruling, the State was precluded by statute from reinstating the case. Id. at 910-11. The appellate court specifically noted that the problem in this case was not the defendant's claim, but that the trial court made a mistake of law in concluding defendant was Indian under the Major Crimes Act. Id. If anything, this case underscores the utility and flexibility of the Rogers test, when correctly applied. It is clear that, using that test, jurisdiction always lay with the State of Washington.

¶18 There simply is no jurisdictional loophole as described by the District Attorney. To cure this nonexistent problem, the State would have this Court adopt a test which is different from, and potentially more restrictive than, the test used in our corresponding federal system. This would be far more likely to result in the kind of confusion the District Attorney warns against. Say this Court were to adopt a particular blood quantum number. A defendant could be a member of a federally recognized tribe, with Indian blood less than that quantum. He would not be Indian in state court, and the State would retain jurisdiction. However, when the convicted defendant filed a writ of habeas corpus in federal court, because he had some Indian blood, he would meet the Rogers test. The federal court would find that the State had no jurisdiction, and the defendant should have been tried in federal court to begin with -- just like McGirt. Consistency and economy of judicial resources compel us to adopt the same definition as that used by the Tenth Circuit.

¶19 Furthermore, we find it inappropriate for this Court to be in the business of deciding who is Indian. As sovereigns, tribes have the authority to determine tribal citizenship. Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 327 (2008); see also United States v. Antelope, 430 U.S. 641, 646 (1977) (Indian status determined by recognition by tribe acting as separate sovereign, not by racial classification). Some tribes have a blood quantum requirement, and some do not. Of those that do, the percentage differs among individual tribes. If a person charged with a crime has some Indian blood, and they are recognized as being an Indian by a tribe or the federal government, this Court need not second-guess that recognition based on an arbitrary mathematical formula. The District Court correctly followed this Court's instructions in the Order remanding this case, determining that the victims had some Indian blood.

Procedural Defenses

¶20 Both the Attorney General and the District Court ask this Court to consider this case barred for a variety of procedural reasons: waiver under the successive capital post-conviction statute, 22 O.S.2011, § 1089(D), and waiver of the jurisdictional challenge; failure to meet the sixty-day filing deadline to raise a previously unavailable legal or factual basis in subsequent post-conviction applications under Rule 9.7(G)(3), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2021); and the doctrine of laches. Through the District Attorney, the State admits that this Court has resolved these issues in this case in our Order remanding for an evidentiary hearing:

Under the particular facts and circumstances of this case, and based on the pleadings in this case before the Court, we find that Petitioner's claim is properly before this court. The issue could not have been previously presented because the legal basis for the claim was unavailable. 22 O.S. §§ 1089(D)(8)(a), 1089(D)(9)(a); McGirt v. Oklahoma, 140 S.Ct. 2452 (2020).

Bosse v. State, PCD-2019-124, Order Remanding for Evidentiary Hearing at 2 (Okl.Cr. Aug. 12, 2020). The State asks us to reconsider this determination, but offers no compelling arguments in support.[8]

¶21 It is settled law that "[s]ubject-matter jurisdiction can never be waived or forfeited." Gonzalez v. Thaler, 565 U.S. 134, 141 (2012). The District Attorney admits that generally litigants "cannot waive the argument that the district court lacks subject-matter jurisdiction," citing United States v. Green, 886 F.3d 1300, 1304 (10th Cir. 2018); see also United States v. Garcia, 936 F.3d 1128, 1140-41 (10th Cir. 2019) (parties can neither waive subject-matter jurisdiction nor consent to trial in a court without jurisdiction). This Court has repeatedly held that the limitations of post-conviction or subsequent post-conviction statutes do not apply to claims of lack of jurisdiction. Wackerly v. State, 2010 OK CR 16, ¶ 4, 237 P.3d 795, 797; Wallace v. State, 1997 OK CR 18, ¶ 15, 935 P.2d 366, 372; see also Murphy v. State, 2005 OK CR 25, ¶¶ 5-7, 124 P.3d 1198, 1200 (recognizing limited scope of post-conviction review, then addressing newly raised jurisdictional claim on the merits). In Wackerly, we also held the time limit on newly raised issues in Rule 9.7 did not apply to jurisdictional questions. Wackerly, 2010 OK CR 16, ¶ 4, 237 P.3d at 797.[9]

¶22 McGirt provides a previously unavailable legal basis for this claim. Subject-matter jurisdiction may -- indeed, must -- be raised at any time. No procedural bar applies, and this issue is properly before us. 22 O.S. §§ 1089(D)(8)(a), 1089(D)(9)(a).

There is no concurrent jurisdiction.

¶23 The General Crimes Act and the Major Crimes Act give federal courts jurisdiction over crimes committed by or against Indians in Indian Country. 18 U.S.C. §§ 1152, 1153. Congress provides that crimes committed in certain locations or under some specific circumstances are within the sole and exclusive jurisdiction of the United States. Section 1152, the General Crimes Act, brings crimes committed in Indian Country within that jurisdiction, unless they lie within the jurisdiction of tribal courts or jurisdiction is otherwise expressly provided by federal law. 18 U.S.C. § 1152; see also 18 U.S.C. § 1153 (Major Crimes Act). This gives federal courts jurisdiction over Indians and non-Indians who commit crimes against Indians in Indian Country. By explicitly noting that it may expressly provide otherwise, Congress has preempted jurisdiction over these crimes in state courts. Indeed, this Court has held that federal law preempts state jurisdiction over crimes committed by or against an Indian in Indian Country. Cravatt v. State, 1992 OK CR 6, ¶ 20, 825 P.2d 277, 280. State courts retain jurisdiction over non-Indians who commit crimes against non-Indians in Indian Country. Id.; Solem, 463 U.S. at 465 n.2; Williams v. United States, 327 U.S. 711, 714 & n.10 (1946).

¶24 The State argues that, despite the clear language of both statute and case law, federal and state courts have concurrent jurisdiction over non-Indians under the General Crimes Act. The law does not support this argument. The Attorney General relies in part on United States v. McBratney, 104 U.S. 621 (1881) to support his argument. However, in McBratney, a non-Indian murdered another non-Indian within the boundaries of the Ute Reservation. The Supreme Court held that the federal government had no jurisdiction to prosecute a crime committed in Indian Country where neither the perpetrator nor the victim were Indian. Id., 104 U.S. at 624. Nothing in that opinion supports a conclusion that, where federal jurisdiction exists by statute, states have concurrent jurisdiction as well. And the Supreme Court itself later refuted any such interpretation. In Donnelly v. United States, the Court held that McBratney did not apply to "offenses committed by or against Indians," which were subject to federal jurisdiction. Donnelly, 228 U.S. 243, 271-72 (1913). In the context of federal criminal jurisprudence and Indian Country, Donnelly reaffirmed Congress's preemption of state jurisdiction over crimes by or against Indians.[10] More recently, the Court has noted that where federal jurisdiction lies under Section 1153, it preempts state jurisdiction. United States v. John, 437 U.S. 634, 651 (1978); see also Goforth v. State, 1982 OK CR 48, ¶ 5, 644 P.2d 114, 115-16 (federal jurisdiction under §§ 1152, 1153 preempts state jurisdiction except as to crimes among non-Indians).

¶25 The General Crimes Act provides that federal jurisdiction may be changed by law. 18 U.S.C. § 1152. And Congress has done so, giving the State of Kansas criminal jurisdiction on Indian reservations in that state. The Kansas Act conferred jurisdiction on Kansas courts for offenses of state law committed by or against Indians on reservations in Kansas. 18 U.S.C. § 3243. The Supreme Court determined that this Act confers concurrent jurisdiction on State courts only to the extent that the State of Kansas may prosecute people for state law offenses that are also punishable as offenses under federal law; otherwise, the jurisdiction to prosecute federal crimes committed on Kansas reservations lies with the federal government. Negonsott v. Samuels, 507 U.S. 99, 105--106 (1993).

¶26 Congress also created the opportunity for six specific states to exercise jurisdiction over crimes committed in Indian Country by enacting Public Law 280. Act of Aug. 15, 1953, Pub. L. No. 67, Stat. 588, codified at 18 U.S.C. § 1162, 25 U.S.C. § 1321-26; 18 U.S.C. § 1162(a). In a separate provision, P.L. 280 created a framework for other states to assume jurisdiction over crimes committed in Indian Country, with the consent of the affected tribe; the state and the federal government may have concurrent jurisdiction if the affected tribe requests it and with the consent of the Attorney General. 25 U.S.C. § 1321(a). Oklahoma has not exercised the options for criminal jurisdiction afforded by P.L. 280. Cravatt, ¶ 15, 825 P.2d at 279.

¶27 The Kansas Act and P.L. 280 would have been unnecessary if, as the State argues, state and federal governments already have concurrent jurisdiction over non-Indians who commit crimes in Indian Country. Rather, these Acts are examples of how Congress may implement the provision in Section 1152, allowing for an exception to federal jurisdiction. Congress has written no law similarly conferring jurisdiction on Oklahoma courts, or otherwise modifying the statutory provisions granting jurisdiction for prosecution of crimes in Indian Country to federal courts in Oklahoma. Respondent does not suggest it has.

¶28 Absent any law, compact, or treaty allowing for jurisdiction in state, federal or tribal courts, federal and tribal governments have jurisdiction over crimes committed by or against Indians in Indian Country, and state jurisdiction over those crimes is preempted by federal law. The State of Oklahoma does not have concurrent jurisdiction to prosecute Petitioner.

Conclusion

¶29 Petitioner's victims were Indian, and this crime was committed in Indian Country. The federal government, not the State of Oklahoma, has jurisdiction to prosecute Petitioner. Proposition I is granted. Propositions II and III are moot.

DECISION

¶30 The Judgment and Sentence of the District Court of McClain County is REVERSED and the case is REMANDED with instructions to DISMISS. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2021), the MANDATE is STAYED for twenty (20) days from the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF McCLAIN COUNTY
THE HONORABLE LEAH EDWARDS, DISTRICT JUDGE

 
 
 
 ATTORNEYS ON APPEAL

 MICHAEL W. LEIBERMAN
 SARAH M. JERNIGAN
 ASST. FEDERAL PUBLIC DEFENDERS
 WESTERN DISTRICT OF OKLAHOMA
 215 DEAN A. MCGEE, SUITE 707
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR PETITIONER

 MIKE HUNTER
 ATTORNEY GENERAL OF OKLAHOMA
 MITHUN MANSINGHANI
 SOLICITOR GENERAL OF OKLAHOMA
 JENNIFER L. CRABB
 CAROLINE E.J. HUNT
 ASST. ATTORNEYS GENERAL
 313 NE 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR RESPONDENT

 STEPHEN GREETHAM
 DEBRA GEE
 4001 N. LINCOLN BLVD.
 OKLAHOMA CITY, OK 73105
 FRANK S. HOLLEMAN
 DOUGLAS B.L. ENDRESON
 SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY, LLP
 1425 K STREET, NW, SUITE 600
 WASHINGTON, DC 2005
 ATTORNEYS FOR AMICUS CURIAE CHICKASAW NATION
 
 
  
 
 
 

OPINION BY KUEHN, P.J.

ROWLAND, V.P.J.: CONCUR IN RESULTS
LUMPKIN, J.: CONCUR IN RESULTS
LEWIS, J.: SPECIALLY CONCUR
HUDSON, J.: CONCUR IN RESULTS

FOOTNOTES

[1] Bosse v. State, 2017 OK CR 10, 400 P.3d 834, reh'g granted and relief denied, 2017 OK CR 19, 406 P.3d 26, cert. denied, 138 S.Ct. 1264 (2018).

[2] Bosse v. State, No. PCD-2013-360 (Okl.Cr. Dec.16, 2015) (not for publication).

[3] The Judge did not avoid the issue. She refused to set a quantum amount as requested by the District Attorney and followed this Court's Remand Order directing her to find "some" Indian blood under the definitions recognized by the Tenth Circuit opinions referenced.

[4] United States v. Rogers, 45 U.S. 567, 572-73 (1846).

[5] In support of his claim that more than "some" Indian blood is required, Respondent cites dicta in Goforth v. State, 1982 OK CR 48, ¶ 6, 644 P.2d 114, 116. With almost a quarter blood quantum, the defendant easily met the requirement of the first prong, and this Court did not further analyze that issue. However, in referring to the two-part test, this Court in a 1982 decision, used the word "significant" rather than "some." Id. This single word, describing an issue not the focus of the appeal, does not substitute for the entire body of state and federal jurisprudence correctly stating the test.

[6] Interestingly, the District Attorney argues instead that a "loophole" will exist if we do not have the same standard as the Tenth Circuit.

[7] In addition, to require a specific blood quantum would be out of step with other recent developments. In 2018, Congress amended the Stigler Act. Enacted in 1947, that Act was one of several Acts restricting the conveyance of lands that were allotted to citizens of the Five Tribes, if the owner had one-half or more of Indian blood. The restrictions on conveyance were designed to protect tribal citizens. As time passed, requiring such a high blood quantum stripped those protections from many owners and reduced the amount of restricted land. The recent amendment struck this provision, replacing it with the phrase "of whatever degree of Indian blood." Stigler Act Amendments of 2018, P.L. 115-399, Sec. 1(a). We will not disregard this clear statement of Congressional intent regarding a blood quantum requirement for the Five Tribes.

[8] The State argues both that application of McGirt will have significant consequences for criminal prosecutions, and that waiver should apply because there is really nothing new about the claim. Taken as a whole, the arguments advanced by the State in both its Response and Supplemental Brief support a conclusion that, although similar claims may have been raised in the past in other cases, the primacy of State jurisdiction was considered settled and those claims had not been expected to prevail. The legal basis for this claim was unavailable under Section 1089(D).

[9] The principle that subject-matter jurisdiction may not be waived also settles the State's argument based on laches -- that Petitioner waited too long to raise his claim, and the passage of time makes resolution of the issue, or a grant of relief, difficult to determine or implement. None of the cases on which the State relies concern a claim of lack of jurisdiction.

[10] Respondent also misunderstands the discussion in Ex parte Wilson, 140 U.S. 575 (1891). There, the defendant and victim were non-Indian. The defendant argued that the federal government could not retain jurisdiction over crimes committed by and against Indians while allowing state jurisdiction over crimes involving non-Indians committed on a reservation; he claimed that either the federal government had sole and exclusive jurisdiction over every crime, or it had none at all. Id. at 577. The Court rejected this argument, noting that Congress had the power to grant and limit jurisdiction in federal courts. Id. at 578.

ROWLAND, VICE PRESIDING JUDGE, CONCURRING IN RESULTS:

¶1 I concur in the result of the majority opinion, but write separately to relate my views on two of the issues discussed therein, namely the test for Indian status and the use of the term subject matter jurisdiction.

A. The Test for Indian Status

¶2 My first objection with the majority opinion is its dismissal of the thought that this Court should decide who is Indian. Making a finding on the defendant's Indian status is precisely what we must do in order to determine whether the State of Oklahoma has jurisdiction since federal jurisdiction applies only to Indians. One question before us is what test we should employ to decide this particular component of Bosse's claim. In that regard, I agree fully with the majority that our test for Indian status must be identical to that used by the United States Court of Appeals for the Tenth Circuit.

¶3 The Major Crimes Act is pre-emptive of state criminal jurisdiction "when it applies...." United States v. John, 437 U.S. 634, 651 (1978) (emphasis added). If the Indian Country Crimes Act or Major Crimes Act do not apply, then the State of Oklahoma, as a sovereign with general police powers, has obvious authority to prosecute and punish crimes within its borders. Adopting a test different from that used by federal courts risks this Court dismissing a case where the crime was committed in Indian country on the basis that a defendant is Indian and the federal court, under a different test, determining the defendant is not Indian and thus there is no federal jurisdiction.[1] That is the type of jurisdictional void this Court warned of in Goforth v. State, 1982 OK CR 48, 644 P.2d 114, where we interpreted Article 1, Section 3 of the Oklahoma Constitution to disclaim jurisdiction over Indian lands only when federal jurisdiction is apparent. "[W]here federal law does not purport to confer jurisdiction on the United States courts, the Oklahoma Constitution does not deprive Oklahoma courts from obtaining jurisdiction over the matter." Id. 1982 OK CR 48, ¶ 8, 644 P.2d at 116.

B. Subject Matter Jurisdiction

¶4 The other portion of today's majority opinion with which I do not agree is that the federal criminal statutes involved here deprive Oklahoma courts of subject matter jurisdiction. "Subject matter jurisdiction defines the court's authority to hear a given type of case." Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009). Our cases recognize three components to jurisdiction: "(1) jurisdiction over the subject matter--the subject matter in this connection was the criminal offense of murder, (2) jurisdiction over the person, and (3) the authority under law to pronounce the particular judgment and sentence herein rendered." Petition of Dare, 1962 OK CR 35, ¶ 5, 370 P.2d 846, 850--51. Like Dare, the subject matter in this case is a murder prosecution. The subject matter jurisdiction of Oklahoma courts is established by Article 7 of our State Constitution and Title 20 of our statutes which grant general jurisdiction, including over murder cases, to our district trial courts. Basic rules of federalism dictate that Congress has no power to expand or diminish that jurisdiction except where Congress has created a federal cause of action and allowed state courts to assume jurisdiction. See Simard v. Resolution Tr. Corp., 639 A.2d 540, 545 (D.C. 1994) (noting presumption of concurrent jurisdiction among federal and state courts is rebutted only by a clear expression by Congress vesting federal courts with exclusive jurisdiction). Were it otherwise, Congress could legislatively tinker with the authority of state courts to hear all type of state crimes or civil causes of action.

¶5 What Congress can do and has done is exercise its own territorial jurisdiction over Indians in Indian Country by virtue of its plenary power to regulate affairs with Indian tribes. "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights." South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998). Federal criminal authority over so-called "federal enclaves" is found at 18 U.S.C. § 7, which begins with the words, "The term 'special maritime and territorial jurisdiction of the United States', as used in this title, includes...." (emphasis added). The Indian Country Crimes Act, 18 U.S.C. § 1152, with exceptions, "extends the general criminal laws of federal maritime and enclave jurisdiction to Indian country...." Negonsott v. Samuels, 507 U.S. 99, 102 (1993). Thus a plain reading of Negonsott in tandem with Section 7 makes clear that it is territorial jurisdiction, not subject matter jurisdiction, which is at issue. See also United States v. Smith, 925 F.3d 410, 415 (9th Cir.), cert. denied, 140 S.Ct. 407 (2019) (finding Indian Country is a federal enclave for purposes of 18 U.S.C. § 7). This is likely why none of the cases cited in the majority opinion hold that the state lacks subject matter jurisdiction over crimes by or against Indians in Indian Country. In United States v. Langford, 641 F.3d 1195, 1197 n.1 (10th Cir. 2011), the Tenth Circuit stated explicitly that the federal jurisdiction under these statutes is not subject matter jurisdiction:

When we speak of jurisdiction, we mean sovereign authority, not subject matter jurisdiction. Cf. Prentiss, 256 F.3d at 982 (disclaiming the application of subject matter jurisdiction analysis to cases involving an inquiry under the ICCA). This is consistent with use of the term in United States v. McBratney, 104 U.S. 621, 623--4, 26 L.Ed. 869 (1881).

(Emphasis added).

¶6 This is an important distinction, because as the majority makes clear, the lack of subject matter jurisdiction cannot be waived or forfeited and may be raised at any point in the litigation. Conversely, territorial jurisdiction may be subject to waiver. See Application of Poston, 1955 OK CR 39, ¶ 35, 281 P.2d 776, 785 (request for relief on ground that district court did not have territorial jurisdiction was denied; claim was deemed waived because it was not raised below). See also State v. Randle, 2002 WI App 116, ¶ 14, 252 Wis. 2d 743, 751, 647 N.W.2d 324, 329 (concluding territorial jurisdiction subject to waiver in some instances); Porter v. Commonwealth, 276 Va. 203, 229, 661 S.E.2d 415, 427 (Va.2008) (territorial jurisdiction is waived if not properly and timely raised); In re Teagan K.-O., 335 Conn. 745, 765 n. 22, 242 A.3d 59, 73 n. 22 (Conn.2020) (territorial jurisdiction may be subject to waiver). But see State v. Dudley, 364 S.C. 578, 582, 614 S.E.2d 623, 625-26 (2005) ("Although territorial jurisdiction is not a component of subject matter jurisdiction, we hold that it is a fundamental issue that may be raised by a party or by a court at any point in the proceeding.... The exercise of extraterritorial jurisdiction implicates the state's sovereignty, a question so elemental that we hold it cannot be waived by conduct or by consent." (Citation and footnote omitted.)).

¶7 Characterizing Sections 1152 and 1153 as implicating subject matter jurisdiction would allow a defendant, knowing he is Indian and that his crimes fall within the Major Crimes Act, to forum shop, by rolling the dice at a state trial and then wiping that slate clean if he receives an unsatisfactory verdict by asserting his Indian status. Viewing it as territorial jurisdiction avoids this absurdity, and would allow the possibility that procedural bars, laches, etc. might preclude some McGirt claims.[2]

 

¶8 In this case, however, I agree with the majority that our earlier ruling in our Remand Order--that Bosse timely met the requirements for raising a claim based on new law under the Capital Post-Conviction Act--resolved any claim that Bosse is procedurally barred from asserting this claim on post-conviction. Accordingly, I concur in the result.

 

FOOTNOTES

[1] Because, as explained later in this writing, I do not think subject matter jurisdiction is implicated, I see no reason the State could not refile its charges in such an instance, but that is, of course, not before the Court at this time.

[2] The McGirt opinion tacitly acknowledges potential procedural bars, noting the State of Oklahoma had "put aside whatever procedural defenses it might have." McGirt, 140 S.Ct. at 2460. Those defenses would not be relevant if subject matter jurisdiction, which is non-waivable, were concerned.

LUMPKIN, JUDGE: CONCURRING IN RESULTS:

¶1 Bound by my oath and the Federal-State relationships dictated by the U.S. Constitution, I must at a minimum concur in the results of this opinion. While our nation's judicial structure requires me to apply the majority opinion in the 5-4 decision of the U.S. Supreme Court in McGirt v. Oklahoma, __ U.S. __, 140 S. Ct. 2452 (2020), I do so reluctantly. Upon the first reading of the majority opinion in McGirt I initially formed the belief that it was a result in search of an opinion to support it. Then upon reading the dissents by Chief Justice Roberts and Justice Thomas I was forced to conclude the Majority had totally failed to follow the Court's own precedents, but had cherry picked statutes and treaties, without giving historical context to them. The Majority then proceeded to do what an average citizen who had been fully informed of the law and facts as set out in the dissents would view as an exercise of raw judicial power to reach a decision which contravened not only the history leading to the disestablishment of the Indian reservations in Oklahoma, but also willfully disregarded and failed to apply the Court's own precedents to the issue at hand.

¶2 My quandary is one of ethics and morality. One of the first things I was taught when I began my service in the Marine Corps was that I had a duty to follow lawful orders, and that same duty required me to resist unlawful orders. Chief Justice Roberts' scholarly and judicially penned dissent, actually following the Court's precedents and required analysis, vividly reveals the failure of the majority opinion to follow the rule of law and apply over a century of precedent and history, and to accept the fact that no Indian reservations remain in the State of Oklahoma.[1] The result seems to be some form of "social justice" created out of whole cloth rather than a continuation of the solid precedents the Court has established over the last 100 years or more.

¶3 The question I see presented is should I blindly follow and apply the majority opinion or do I join with Chief Justice Roberts and the dissenters in McGirt and recognize "the emperor has no clothes" as to the adherence to following the rule of law in the application of the McGirt decision?

¶4 My oath and adherence to the Federal-State relationship under the U.S. Constitution mandate that I fulfill my duties and apply the edict of the majority opinion in McGirt. However, I am not required to do so blindly and without noting the flaws of the opinion as set out in the dissents. Chief Justice Roberts and Justice Thomas eloquently show the Majority's mischaracterization of Congress's actions and history with the Indian reservations. Their dissents further demonstrate that at the time of Oklahoma Statehood in 1907, all parties accepted the fact that Indian reservations in the state had been disestablished and no longer existed. I take this position to adhere to my oath as a judge and lawyer without any disrespect to our Federal-State structure. I simply believe that when reasonable minds differ they must both be reviewing the totality of the law and facts.

FOOTNOTES

[1] Senator Elmer Thomas, D-Oklahoma, was a member of the Senate Committee on Indian Affairs. After hearing the Commissioner's speech regarding the Indian Reorganization Act (IRA) in 1934, Senator Thomas opined as follows:

I can hardly see where it (the IRA) could operate in a State like mine where the Indians are all scattered out among the whites and they have no reservation, and they could not get them into a community without you would go and buy land and put them on it. Then they would be surrounded very likely with thickly populated white section with whom they would trade and associate. I just cannot get through my mind how this bill can possibly be made to operate in a State of thickly-settled population. (emphasis added).

John Collier, Commissioner of Indian Affairs, Memorandum of Explanation (regarding S. 2755), p. 145, hearing before the United States Senate Committee on Indian Affairs, February 27, 1934. Senator Morris Sheppard, D-Texas, also on the Senate Committee on Indian Affairs, stated in response to the Commissioner's speech that in Oklahoma, he did not think "we could look forward to building up huge reservations such as we have granted to the Indians in the past." Id. at 157. In 1940, in the Foreword to Felix S. Cohen, Handbook of Federal Indian Law (1942), Secretary of the Interior Harold Ickes wrote in support of the IRA, "[t]he continued application of the allotment laws, under which Indian wards have lost more than two-thirds of their reservation lands, while the costs of Federal administration of these lands have steadily mounted, must be terminated." (emphasis added).

LEWIS, JUDGE, SPECIALLY CONCURRING:

¶1 I write separately to address the notion that McGirt v. Oklahoma, 140 S.Ct. 2452 (2020) addresses something less than subject matter jurisdiction over an Indian who commits a crime in Indian Country or over any person who commits a crime against an Indian in Indian Country. McGirt, of course, serves as the latest waypoint for our discussion on the treatment of criminal cases arising within the historic boundaries of Indian reservations which were granted by the United States Government many years ago. McGirt, 140 S.Ct. at 2460, 2480. The main issue in McGirt was whether those reservations were disestablished by legislative action at any point after being granted.

¶2 McGirt deals specifically, and exclusively, with the boundaries of the reservation granted to the Muscogee (Creek) Nation. McGirt, 140 S.Ct. at 2459, 2479. However, the other Indian Nations comprising the Five Civilized Tribes have historical treaties with language indistinct from the treaty between the Muscogee (Creek) Nation and the federal government. Therefore, this case involving a crime occurring within the historical boundaries of the Chickasaw Nation Reservation must be analyzed in the same manner as the boundaries of the Muscogee (Creek) Nation Reservation. The District Court below conducted a thorough analysis and concluded that the reservation was not disestablished. I agree with this conclusion.

¶3 McGirt was also clear that if the reservation was not disestablished by the U.S. Congress, Oklahoma has no right to prosecute Indians for crimes committed within the historical boundaries of the Indian reservations. McGirt, 140 S.Ct. at 2460. Therefore, because the Chickasaw Nation Reservation was not disestablished, the State of Oklahoma has no authority to prosecute Indians for crimes committed within the boundaries of the Chickasaw Nation Reservation, nor does Oklahoma have jurisdiction over any person who commits a crime against an Indian within the boundaries of the Chickasaw Nation Reservation as was the case here. The federal government has exclusive jurisdiction over those cases. 18 U.S.C. § 1153(a).

¶4 A lack of subject matter jurisdiction leaves a court without authority to adjudicate a matter. This Court has held that subject matter jurisdiction cannot be conferred by consent, nor can it be waived, and it may be raised at any time. Armstrong v. State, 1926 OK CR 259, 248 P. 877, 878; Cravatt v. State, 1992 OK CR 6, ¶ 7, 825 P.2d 277, 280; Magnan v. State, 2009 OK CR 16, ¶¶ 9 & 12, 207 P.3d 397, 402 (holding that jurisdiction over major crimes in Indian Country is exclusively federal).

¶5 Because the issue in this case is one of subject matter jurisdiction, I concur that this case must be reversed and remanded with instructions to dismiss.

HUDSON, J., CONCURRING IN RESULTS:

¶1 Today's decision applies McGirt v. Oklahoma, 140 S. Ct. 2452 (2020) to the facts of this case. I concur in the result of the majority's opinion based on the stipulations below concerning the victims' Indian status and the location of these crimes within the historic boundaries of the Chickasaw Reservation. Under McGirt, the State cannot prosecute Petitioner because of the Indian status of the victims and the location of this crime within Indian Country as defined by federal law. I therefore as a matter of stare decisis fully concur in today's decision. 

¶2 I disagree, however, with the majority's adoption as binding precedent of the District Court's finding that Congress never disestablished the Chickasaw Reservation. Here, the State took no position below on whether the Chickasaw Nation has, or had, a reservation. The State's tactic of passivity has created a legal void in this Court's ability to adjudicate properly the facts underlying Petitioner's argument. This Court is left with only the trial court's conclusions of law to review for an abuse of discretion. We should find no abuse of discretion based on the record evidence presented. But we should not establish as binding precedent that the Chickasaw Nation was never disestablished based on this record.

¶3 I also fully join Judge Rowland's special writing concerning the test for Indian status and the use of the term subject matter jurisdiction.

¶4 Finally, I write separately to note that McGirt resurrects an odd sort of Indian reservation. One where a vast network of cities and towns dominate the regional economy and provide modern cultural, social, educational and employment opportunities for all people on the reservation. Where the landscape is blanketed by modern roads and highways. Where non-Indians own property (lots of it), run businesses and make up the vast majority of inhabitants. On its face, this reservation looks like any other slice of the American heartland--one dotted with large urban centers, small rural towns and suburbs all linked by a modern infrastructure that connects its inhabitants, regardless of race (or creed), and drives a surprisingly diverse economy. This is an impressive place--a modern marvel in some ways--where Indians and non-Indians have lived and worked together since at least statehood, over a century.

¶5 McGirt orders us to forget all of that and instead focus on whether Congress expressly disestablished the reservation. We are told this is a cut-and-dried legal matter. One resolved by reference to treaties made with the Five Civilized Tribes dating back to the nineteenth century. Ignore that Oklahoma has continuously asserted jurisdiction over this land since statehood, let alone the modern demographics of the area.

¶6 The immediate effect under federal law is to prevent state courts from exercising criminal jurisdiction over a large swath of Greater Tulsa and much of eastern Oklahoma. Yet the effects of McGirt range much further. The present case illuminates some of that decision's consequences. Crime victims and their family members in this and a myriad of other cases previously prosecuted by the State can look forward to a do-over in federal court of the criminal proceedings where McGirt applies. And they are the lucky ones. Some cases may not be prosecuted at all by federal authorities because of issues with the statute of limitations, the loss of evidence, missing witnesses or simply the passage of time. All of this foreshadows a hugely destabilizing force to public safety in eastern Oklahoma.

¶7 McGirt must seem like a cruel joke for those victims and their family members who are forced to endure such extreme consequences in their case. One can certainly be forgiven for having difficulty seeing where--or even when--the reservation begins and ends in this new legal landscape. Today's decision on its face does little to vindicate tribal sovereignty and even less to persuade that a reservation in name only is necessary for anybody's well-being. The latter point has become painfully obvious from the growing number of cases like this one that come before this Court where non-Indian defendants are challenging their state convictions using McGirt because their victims were Indian.

¶8 Congress may have the final say on McGirt. In McGirt, the court recognized that Congress has the authority to take corrective action, up to and including disestablishment of the reservation. We shall see if any practical solution is reached as one is surely needed. In the meantime, cases like Petitioner's remain in limbo until federal authorities can work them out. Crime victims and their families are left to run the gauntlet of the criminal justice system once again, this time in federal court. And the clock is running on whether the federal system can keep up with the large volume of new cases undoubtedly heading their way from state court.

 






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 

Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 4, HOGNER v. STATE
Discussed
 2021 OK CR 6, SIZEMORE v. STATE
Cited
 2021 OK CR 7, SPEARS v. STATE
Discussed at Length


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1992 OK CR 6, 825 P.2d 277, CRAVATT v. STATE
Discussed at Length
 1926 OK CR 259, 248 P. 877, 35 Okl.Cr. 116, Armstrong v State
Discussed
 2005 OK CR 25, 124 P.3d 1198, MURPHY v. STATE
Discussed
 2009 OK CR 16, 207 P.3d 397, MAGNAN v. STATE
Discussed
 2010 OK CR 16, 237 P.3d 795, WACKERLY v. STATE
Discussed at Length
 2017 OK CR 10, 400 P.3d 834, BOSSE v. STATE
Discussed
 2017 OK CR 19, 406 P.3d 26, BOSSE v. STATE
Discussed
 1955 OK CR 39, 281 P.2d 776, APPLICATION OF POSTON
Discussed
 1962 OK CR 35, 370 P.2d 846, IN RE DARE
Discussed
 1982 OK CR 48, 644 P.2d 114, GOFORTH v. STATE
Discussed at Length
 1997 OK CR 18, 935 P.2d 366, Wallace v. State
Discussed
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 1089, Post-Conviction Relief for Death Penalty Conviction - Grounds for Appeal
Discussed at Length


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA